UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

William McCabe and Service Station
Vending Equipment, Inc.,

                        Plaintiffs,

                                                     Civ. No. 07-4553 (RHK/JSM)
                                                     **MEMORANDUM OPINION
                                                     AND ORDER**

v.

AIR-serv Group, LLC, J. Gregory Muldoon,
and Thomas J. Bauer,

                        Defendants.

Mark A. Jacobson, Christopher R. Smith, Karla M. Vehrs, Lindquist & Vennum PLLP, Minneapolis, Minnesota, for Plaintiffs.

Jon S. Swierzewski, Cynthia M. Klaus, Nicholas M. Lewandowski, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

Plaintiffs William McCabe and Service Station Vending Equipment, Inc. (collectively, "McCabe") seek a preliminary injunction enjoining Defendant AIR-serv Group, LLC ("AIR-serv") from terminating distributor agreements between the parties. For the reasons set forth below, the Court will deny the Motion.

## BACKGROUND

### I.  The Parties

In the early 1980s, AIR-serv began manufacturing and selling coin-operated tire-inflator machines and coin-operated automobile vacuums, which were primarily installed

at service stations and convenience stores across the nation. (Bauer Aff. ¶¶ 4-5.) AIR-serv sold its machines directly to independent distributors, who were assigned various territories throughout the United States. (Id. ¶ 5.)

McCabe is the owner of Service Station Vending Equipment, Inc., and he operates two AIR-serv distributorships. (Compl. ¶ 2.) McCabe places and services machines purchased from AIR-serv at different business locations; it shares revenue with the business where the machines are located for the duration of the placement agreement. (Id. ¶ 14.) He retains ownership of the equipment and he uses his share of the vending revenue to pay off the financing for the equipment. (Id. ¶¶ 13-14.)

In the 1990s, AIR-serv shifted its focus to the development of chain accounts, such as Exxon Mobil, 7-Eleven, and others, with locations in multiple states for the placement of its machines. (Muldoon Aff. ¶ 7.) When AIR-serv secured a new chain account, it gained the exclusive right to place and service air and vacuum machines at all of the account's locations. (Id. ¶¶ 8-10; Bauer Aff. ¶¶ 6-9.) AIR-serv currently services over 23,000 machines and has over 100 contracts with chain accounts. (Bauer Aff. ¶¶ 7-11.) After developing its chain-account business, AIR-serv turned over most of the locations of each account to its distributors to service. Regardless of who services the machines, the revenue collected on each machine is tabulated and the appropriate commission is paid to each chain account by AIR-serv. (Id. ¶ 9.)

Over time AIR-serv found itself selling fewer and fewer machines to distributors. (Id. ¶ 16.) By the mid-2000's, very little of AIR-serv's revenues came from the manufacture and sale of machines. (Id.) When AIR-serv was primarily a manufacturer,

it had more than 130 distributors, but that number fell to 4 by the end of 2006, of which McCabe is one. (Id. ¶ 17.)

## II.     The Distributor Agreements Between McCabe and AIR-serv

AIR-serv entered into separate distributor agreements with McCabe on January 23, 1991 (covering specified territories in New York) and on January 2, 2001 (covering the territory of Connecticut). (Bauer Aff. ¶ 3, Exs. A (New York) & B (Connecticut) ("Distributor Agreements").)[1] The Distributor Agreements gave McCabe the right to purchase machines from AIR-serv and to solicit locations to place those machines within prescribed territories (seven counties in New York and the entire state of Connecticut). (Id.) They also provide, with a few exceptions, that AIR-serv would not grant to another distributor the right to place, sell, or lease AIR-serv products within the distributor's territory so long as the distributor has met the minimum quotas and terms of the Distributor Agreements. (Id. ¶ 2.) AIR-serv, however, expressly reserved the right to sell and otherwise market machines to chain accounts without regard to whether or not it had locations within McCabe's territory. (Id.)

The Distributor Agreements also provide that "[a]ll Products . . . shall be purchased by [McCabe] at 'the bona fide wholesale price.'" (Id. ¶ 6.) The Distributor Agreements had two-year initial terms and "automatically renew for consecutive one-year periods . . . provided neither party gives notice to the other of its intent to terminate [the agreement] at least ninety (90) days prior to the end of any term." (Id. ¶ 10.) They

---

[1] The two distributor agreements are virtually identical. Therefore, the Court will refer to both agreements as "Distributor Agreements."

also contain a Minnesota choice-of-law clause.[2] (Id. ¶ 20.) In addition, the Distributor Agreements provide that "no alterations, amendments or further understandings are binding unless reduced to writing and properly executed by [McCabe and AIR-serv]." (Id. ¶ 22.)

In 1994, AIR-serv established Installation and Operation Procedures ("Operation Procedures") for each chain account, which were required to be accepted by a distributor in order to service the account. (Bobert Aff. ¶¶ 27-28.) McCabe signed the Operation Procedures for every chain account that had locations within his assigned territories. (McCabe Aff. ¶ 55, Ex. 4.) The Operation Procedures generally specify the manner of installation, type of equipment, and procedures for centralized collection, reporting and payment. (McCabe Aff. Ex. 4; Muldoon Aff. ¶ 10.) They also provide that, upon termination, if AIR-serv has a continuing agreement with the national account, it may repurchase the distributor's equipment installed at the chain-account locations based on a specified formula,[3] unless the parties agreed that the equipment may be removed. (McCabe Aff. Ex. 4, Addendum I.) AIR-serv charges McCabe a monthly management fee for each machine installed at each chain-account location. (Id.; Def.'s Mem. at 8; Pl.'s Opp'n Mem. at 8.) The monthly management fee was initially $2 per machine, but has increased to $6-$8 per machine for most accounts. (McCabe Aff. ¶ 66.)

---

[2] The Distributor Agreements also contain forum-selection clauses, in which the parties agreed to submit to the exclusive jurisdiction of Minnesota courts.

[3] The formula uses a five-year depreciation schedule based upon the actual cost of the equipment. (McCabe Aff. Ex. 4, Addendum I; Bobert Aff. ¶ 28; Muldoon Aff. ¶ 16.)

**III.    AIR-serv's Transition Out of Distribution**

In July 1998, AIR-serv's founder, David Bobert, sold the assets of AIR-serv to a private equity firm, Prometheus LLC.[4] (Bobert Aff. ¶¶ 2, 21.) After the sale, AIR-serv continued to encourage its distributors, including McCabe, to aggressively work their territories for AIR-serv, to continue to invest in the AIR-serv brand, and to increase market share for AIR-serv products. (McCabe Aff. ¶ 76.) In September 1998, AIR-serv informed its distributors, including McCabe, that it would be receptive to purchasing the distributors' businesses. (McCabe Aff. ¶ 77.) Between early 1998 and mid-2003, AIR-serv started to acquire the businesses of its distributors and its competitors. (Bauer Aff. ¶¶ 19-20.) When AIR-serv acquired a business, and with it, the contracts that the business had with chain accounts and independent location owners, it would generally service those locations itself. (Muldoon Aff. ¶ 14.)

By mid-2003, AIR-serv was servicing a majority of the chain-account locations. (Id.) AIR-serv continued to assure McCabe that it valued the relationships it had with the distributors, but it also indicated that its manufacturing business was no longer of primary importance. (McCabe Aff. ¶¶ 84-85; Muldoon Aff. ¶ 23.) McCabe continued to make additional investments in AIR-serv machines to be placed at locations within his territories. (Id. ¶ 86.) In October 2003, McCabe was aware that AIR-serv was not renewing all of its distributors' agreements. (Muldoon Aff. ¶ 23.) AIR-serv also

---

[4] In March 2003, a second investment firm, Wind Point Partners, purchased AIR-serv. In July 2006, a third investment firm, Macquarie Capital Alliance Group, purchased AIR-serv. (McCabe Aff. ¶¶ 87, 93.)

5

indicated to him that it was only a matter of time before he would receive a non-renewal letter. (Id.) In July 2006, AIR-serv reminded McCabe that it was getting closer to the time when it would decide not renew his agreements because of the change in its business model.[5] (Id. ¶ 25.)

## IV. Notice of Non-Renewal

On March 20, 2007, AIR-serv formally notified McCabe of its intent not to renew the Distributor Agreements.[6] As a result, the Distributor Agreement for Connecticut will expire on January 1, 2008, and the Distributor Agreement for New York will expire on January 22, 2008. (McCabe Aff. ¶¶ 101-02, Ex. 17.) On March 23, 2007, AIR-serv notified McCabe that although the Operation Procedures allowed it to terminate McCabe's right to operate the machines at the national accounts upon termination of the Distributor Agreements and to purchase his equipment upon termination, it would waive that right, and allow him to operate the machines at those locations until the expiration of each particular account, so long as he continued to comply with the terms of the Operation Procedures. (Id. Ex. 18.) AIR-serv also indicated that it would give McCabe the option of either selling the equipment under the terms of the Operation Procedures or allow him to remove the equipment from the locations. (Id.)

McCabe never formally responded to either letter. The parties, however, held numerous discussions about the possibility of AIR-serv buying McCabe's distributorship.

---

[5] McCabe asserts that "[t]he first time that AIR-serv told him it was changing its business model and ceasing the manufacture of air machines was with its [notice of non-renewal] letter to [him] in March of 2007." (McCabe Suppl. Aff. ¶ 3.)

[6] AIR-serv also sent its notice of non-renewal to the other three remaining distributors in March 2007. (Muldoon Aff. ¶ 19.)

6

(Bauer Aff. ¶ 18; McCabe Aff. ¶ 104.) AIR-serv ultimately offered McCabe over $20 million for his business, but he rejected this offer. (Bauer Aff. ¶ 18.) On October 29, 2007, AIR-serv reiterated to McCabe its decision not to renew the Distributor Agreements, and that due to his non-response to the March 23 letter, the Operation Procedures would terminate as of the expiration of the respective Distributor Agreements. (McCabe Aff. ¶ 105, Ex. 19; Muldoon Aff. ¶17.)

On November 7, 2007, McCabe brought this action against AIR-serv for breach of contract, violations of the Minnesota Franchise Act, Minn. Stat. § 80.C.01 *et seq.*, violations of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e(b), violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110A, *et seq.*, and promissory and equitable estoppel. On November 15, 2007, McCabe filed the instant Motion for injunctive relief.[7]

## ANALYSIS

### I. Factors for a Preliminary Injunction

In analyzing a motion for a preliminary injunction, the Court must look to the four factors set forth by the Eighth Circuit in Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109 (8th Cir. 1981). Those factors are: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Id. at 114.

---

[7] Briefing was completed on December 14, 2007 and oral argument was held on December 21, 2007.

7

When applying the Dataphase factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999). The party seeking injunctive relief bears the "complete burden" of proving all of the Dataphase factors. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

**A.   Likelihood of Success on the Merits**

   **1.   Applicability of Minnesota Franchise Act[8]**

The Court begins its analysis with McCabe's likelihood of success on the merits of his claims. McCabe asserts that AIR-serv's threatened non-renewal of the Distributor Agreements violates the Minnesota Franchise Act ("MFA") in numerous respects. At the outset, the parties devote a substantial amount of time in their motion papers as to whether McCabe's business meets the definition of a "franchise" under the MFA and whether the MFA even applies. The Court need not resolve this dispute at this stage of the proceedings because even assuming McCabe's business meets the definition of a franchise under the MFA, he is unlikely to succeed on the merits of his claims.

---

[8] McCabe has alleged various violations of the Minnesota Franchise Act ("MFA"), the Connecticut Franchise Act ("CFA"), and the Connecticut Unfair Trade Practices Act ("CUTPA"). The Distributor Agreements, however, contain a Minnesota choice-of-law clause and the parties agree that Minnesota law should govern. Therefore, the Court does not address McCabe's claims under the CFA and CUTPA. The Court also notes, in any event, that the MFA appears to offer more protection to franchisees than the CFA (for example, irreparable harm is presumed under the MFA, see Minn. Stat. § 80C.14, subd. 1, whereas the CFA does not have this presumption).

Therefore, the Court will assume for purposes of this Motion only that McCabe is a franchisee under the MFA.

The Court notes, however, that "where the parties legitimately dispute whether a product distributor is actually a franchisee under the Minnesota Franchise Act, the district court is not required to grant a temporary injunction . . . . [Indeed,] [i]f there is a close factual dispute which could go either way at a trial on the merits, a court should be reluctant to issue a preliminary injunction." See Pacific Equip. & Irrigation, Inc. v. Toro Co., 519 N.W.2d 911, 915 (Minn. Ct. App. 1994).[9]

### 2. McCabe is Unlikely to Succeed on the Merits

First, McCabe argues that AIR-serv has violated the MFA's prohibition on non-renewal for the "purpose of converting the franchisee's business premises to an operation that will be owned by the franchisor for its own account." Minn. Stat. § 80C.14, subd. 4. Yet, the record shows that AIR-serv's decision not to renew was for legitimate business reasons and not for the purpose of taking over McCabe's business. McCabe was fully aware that AIR-serv was changing its business model and would not be continuing its distributor system. Additionally, AIR-serv indicated in its notice of non-renewal that it would no longer be manufacturing compressed air and vacuum vending equipment and

---

[9] In Pacific Equip., the parties had a series of one-year distributor agreements. 519 N.W.2d at 913. The manufacturer decided not to renew the agreements, and the distributor filed suit under the MFA. Id. at 914. The Minnesota Court of Appeals upheld the denial of injunctive relief primarily on the basis that the parties disputed whether the distributor was a franchisee. Id. at 918. Although the Court will assume that McCabe is a franchisee under the MFA for purposes of this Motion, there is no question that the parties legitimately dispute this issue. As such, the Court is reluctant to issue a preliminary injunction under the circumstances presented here. Id. at 918. Nonetheless, the Court will consider all of the Dataphase factors.

consequently would no longer have products to distribute through distributors. Indeed, the record shows that AIR-serv went from having over 130 distributors to just 4 distributors in 2006 and that McCabe was aware of this fact. This is not evidence of a discriminatory intent to take over McCabe's business, but rather is evidence of AIR-serv's intent to execute a change in its business model. Thus, McCabe is unlikely to show that AIR-serv's decision of non-renewal was for the purpose of taking over his business, in violation of the MFA.

Next, McCabe argues that AIR-serv has not given him sufficient time to operate the chain accounts to recover their fair-market value and that he still has significant debt directly related to equipment purchases he made for the chain accounts. The MFA allows a franchise agreement to expire as long as the franchisee receives at least 180-days' notice of non-renewal and an opportunity to operate over a sufficient period of time to enable the franchisee to recover the fair-market value of the business as a going concern. Minn. Stat. § 80C.14, subd. 4. Here, AIR-serv provided McCabe with almost nine months of notice of its intent not to renew the Distributor Agreements. Thus, AIR-serv has complied with the 180-day notice requirement for non-renewal under the MFA. Moreover, the Distributor Agreements each had two-year initial terms, with the New York agreement starting in January 1991 and the Connecticut agreement starting in January 2001. Both of these agreements have been renewed annually since then. Although McCabe continued to make more investments during the terms of the agreements, it is unlikely that he will be able to show that this was an insufficient amount of time to recover the fair-market value of his business. The MFA requires only that

AIR-serv provide McCabe with sufficient time to operate the business, not that he be debt-free at the time of non-renewal.[10]  McCabe's contention that he has not had sufficient time to operate his business to recoup the fair-market value of his investments is undermined by the fact that AIR-serv and McCabe have had a long-term business relationship.[11]  The Court concludes that McCabe is unlikely to succeed on the merits of this claim.

Next, McCabe asserts that it is unfair and inequitable for a franchisor to "impose on a franchisee by contract or rule, whether written or oral, any standard of conduct that is unreasonable." Minn. R. 2860.4400(G).  McCabe argues that is true here because AIR-serv imposed a five-year, straight-line depreciation schedule that would allow it to acquire McCabe's equipment without paying fair value.  The Court determines that McCabe is unlikely to show that AIR-serv violated the MFA here because there is no evidence that AIR-serv "imposed" this depreciation schedule on McCabe.  Indeed, McCabe was free to decline participation in the servicing of the chain accounts.  Furthermore, AIR-serv is not enforcing the provision because it is allowing McCabe to remove the machines.  Thus, it is unlikely McCabe will succeed on the merits of this claim.

---

[10] The record also shows that AIR-serv would give McCabe the option of either selling the equipment under the terms of the Operation Procedures or allow him to remove the equipment from the locations.  McCabe simply makes a conclusory assertion that these two options are unacceptable because he would not receive enough money for selling the machines pursuant to the Operation Procedures or it would be too costly to move them.

[11] The Court also notes that AIR-serv has apparently offered McCabe over $20 million for his business.

11

McCabe also asserts that AIR-serv violated the MFA by discriminating between him and other distributors. In particular, McCabe argues that AIR-serv discriminated against him by refusing to turn over newly-acquired locations within his exclusive territory even though it turned over new locations to other distributors. (McCabe Aff. ¶ 100.) In response, AIR-serv argues that even if that were true, such discrimination would not impact AIR-serv's right not to renew his agreement, but would merely give him a right to damages. The Court agrees. The appropriate remedy for such a violation would be money damages rather than injunctive relief that would force AIR-serv to renew the Distributor Agreements.

Finally, McCabe asserts that AIR-serv violated the MFA by failing to register its franchise, Minn. Stat. § 80C.02, and by failing to make required disclosures in the mandatory public offering statement, Minn. Stat. § 80C.18, subd. 1. There is no dispute that AIR-serv failed to comply with the MFA in this regard. The remedy for such failure, however, is rescission or damages. Minn. Stat. § 80C.17. The Court assumes McCabe does not wish to rescind his Distributor Agreements based on the fact that he is seeking a preliminary injunction compelling AIR-serv to renew the agreements. And, if McCabe is merely seeking damages for this violation, then this is not an appropriate basis for an injunction that would force the parties to continue their relationship. Indeed, any concession that damages are a sufficient remedy would negate his assertion of irreparable

harm.[12]  Accordingly, the Court finds that McCabe is unlikely to succeed on the merits of his claims.

### 3. Promissory Estoppel and Equitable Estoppel Claims

McCabe also claims that AIR-serv should be estopped from ousting him from the chain-account locations by non-renewal based on AIR-serv's past representations that it would continue its relationship with him.  Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact.  Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000).  The application of promissory estoppel requires that: (1) the promisor made a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice.  Olson v. Synergistic Techs. Bus. Sys., Inc., 628 N.W.2d 142, 152 (Minn. 2001).  However, the parties in this case have a contract that deals with the issue of non-renewal, namely, that either party has a right not to renew the agreement as long as they provide 90-days' notice.  Thus, it is highly unlikely that McCabe will be able to show that promissory estoppel applies here because AIR-serv has a contractual right not to renew the Distributor Agreements.

Equitable estoppel prevents a party from "taking unconscionable advantage of [its] own wrong by asserting [its] strict legal rights."  Brekke v. THM Biomedical, Inc., 683 N.W.2d 771, 777 (Minn. 2004).  To establish equitable estoppel, McCabe must show that AIR-serv made a knowing misrepresentation or concealment of a material fact with the

---

[12] The Court notes that if McCabe seeks damages for this claim, he will still need to overcome the three-year statute of limitation provision contained in the MFA.  Minn. Stat. § 80C.17.

intent to induce reliance and that McCabe was ignorant to the misrepresentation and subsequently relied on it to his prejudice. Id. at 777. "A fact is material if it is germane to the unconscionable conduct alleged and works a prejudice to the party." Lunning v. Land O'Lakes, 303 N.W.2d 452, 458 (Minn. 1980).

McCabe asserts that AIR-serv encouraged him to make more investments and led him to believe that AIR-serv would continue its relationship and business model with him so that he would realize the value of his investment if and when he determined to sell his business. The record, however, shows that McCabe has been given plenty of time to realize the fair-market value of his investment. Although AIR-serv encouraged McCabe to continue making investments, it repeatedly told McCabe that it was changing its business model and was interested in purchasing the distributors' businesses. AIR-serv also told McCabe that it was only a matter of time before he would receive a non-renewal letter. Indeed, when AIR-serv was primarily a manufacturer, it had more than 130 distributors, but that number fell to four by the end of 2006, which included McCabe. In essence, McCabe is arguing that he has a contract for a definite duration and that AIR-serv must continue with this relationship until he concludes that it is financially beneficial to terminate his agreement with AIR-serv. But, that is not what AIR-serv promised and certainly not what the parties agreed to. Thus, the Court finds that McCabe is unlikely to prove his equitable-estoppel claim.

**B.     Irreparable Harm**

Irreparable harm is presumed for violations of the MFA. See Minn. Stat.

§ 80C.14.  That presumption, however, may be negated if a party delays in seeking injunctive relief.  See Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) ("any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief" and may, standing alone, justify denial of a preliminary injunction).  On March 20, 2007, AIR-serv formally notified McCabe of its decision not to renew the Distributor Agreements and that these agreements would expire in January 2008.  McCabe asserts that he will go out of business if the Court does not enjoin AIR-serv's threatened non-renewal of the Distributor Agreements.  Yet, McCabe did not immediately file suit or seek temporary injunctive relief.  Instead, he waited until November 2007 -- over seven months -- to commence this action and apply for a preliminary injunction.  McCabe has offered no explanation or justification for his delay other than discussions between the parties. McCabe's unreasonable delay in bringing this action weighs against any presumption of irreparable harm.

The Court also notes that "the availability of money damages negates any presumption of irreparable harm."  Best Vendors, Co. v. Win Stuff, LLC, No. 00-523, 2000 WL 34240391, at *3 (D. Minn. Mar. 13, 2000) (Frank, J.) (citing Pacific Equip., 519 N.W.2d at 915); see also Morse v. City of Waterville, 458 N.W.2d 728, 729-30 (Minn. Ct. App. 1990) (to be irreparable, injury must be of such a nature that money alone could not suffice).  McCabe, however, argues that he will suffer irreparable harm resulting in lost revenues, impairment of his goodwill, and disruption of his relationships with customers.  In particular, he argues that the chain accounts represent 30-40% of his

15

revenue, and without this revenue, he estimates that he would suffer a loss of over $500,000 in annual net revenues. (McCabe Aff. ¶ 70; McCabe Supp. Aff. ¶¶ 11-12.) McCabe claims that this substantial reduction in income would cause him to default on his monthly debt payments of $55,000 and ultimately cause his business to fail. (Id. ¶ 12.) In response, AIR-serv argues that McCabe's damages, if any, are compensable in money damages. The Court agrees.

The circumstances of this case are similar to Crowley Beverage Co. v. Miller Brewing Co., No. 4-85-443, 1985 WL 540 (D. Minn. Apr. 19, 1985), and SICK, Inc. v. Motion Control Corp., No. 01-1496, 2001 WL 1640055 (D. Minn. Sept. 7, 2001). In each case, this Court denied a distributor's motion to enjoin a manufacturer from terminating a distributor agreement because the distributor had an adequate remedy at law. In Crowley, the court found that the incidental effects on the distributor's reputation, goodwill, and other accounts could be measured and included in a damages remedy. 1985 WL 540, at *3; see also Best Vendors, 2000 WL 34240391, at *2-3 (finding that lost profits and lost business relationships from having to remove vending machines are the types of injuries that may be remedied by monetary damages). Thus, even if McCabe were to prevail on the merits of his claims, the Court finds that he has an adequate remedy in the form of money damages to compensate him for any lost revenues, impairment of goodwill and strained customer relationships.

Similarly, in SICK, the distributor argued that his business would be destroyed if the Court did not issue a preliminary injunction to enjoin the manufacturer from terminating their distributor agreement. 2001 WL 1640055, at *4. Notably, the court

16

found that "the loss of a portion of a distributor's business which was compensable in money damages does not amount to irreparable harm." Id. at *5 (citing Crowley, 1985 WL 540, at *2-3 (finding no irreparable harm from termination of distributor agreement where sale of manufacturer's products accounts for only 45% of distributor's annual sales); cf. Ryko Mfg. Co. v. Eden Servs., 759 F.2d 671, 673 (8th Cir. 1985) (finding distributor would be irreparably harmed if the distributor agreement were allowed to terminate because the sales and services of the manufacturer's products accounted for 95% of the distributor's business)). The Court is not persuaded that a loss of 30-40% of McCabe's business will force his business to fail in the absence of injunctive relief; in short, he has not established the threat of irreparable harm. The Court notes that denial of injunctive relief would be justified solely by McCabe's failure to show irreparable harm. Gelco Corp., 811 F.2d at 420 (the moving party's failure to demonstrate irreparable harm ends the inquiry "and the denial of the injunctive request is warranted.")

**C.      Balancing the Harms**

Although lack of "irreparable harm," standing alone, would warrant denial of McCabe's request for injunctive relief, the balance of harms also warrants denial. If a preliminary injunction were granted, it would force the parties to remain in an ongoing business relationship that AIR-serv desires to terminate. See O.M. Droney Beverage Co. v. Miller Brewing Co., 365 F. Supp. 1067, 1070 (D. Minn. 1973) (explaining that obvious difficulties arise in the enforcement of an injunction that requires the parties to "remain married"). It would also force AIR-serv to continue a business model it no longer wishes to maintain despite giving ample notice to McCabe of its intent not to renew the

17

Distributor Agreements. Therefore, the balance of harms favors denial of McCabe's Motion.

**D.     Public Interest**

McCabe asserts that the public interest favors that the Court maintains the status quo until a trial on the merits. As explained above, McCabe is unlikely to succeed on the merits of his claims under the MFA and he has not established irreparable harm. Furthermore, "[p]ublic policy would not support requiring the parties to remain in a business relationship that is unsatisfactory." Id. at 915-16.[13] Accordingly, the Court concludes that a preliminary injunction would not further the public interest.

## CONCLUSION

A preliminary injunction is an extraordinary and drastic remedy. The Court has carefully weighed all of the Dataphase factors and has determined that the balance of equities does not so favor McCabe that justice requires the Court to intervene and issue an injunction. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that McCabe's Motion for a Preliminary Injunction (Doc. No. 3) is **DENIED**.[14]

Dated: December  28 , 2007                              s/Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge

---

[13] McCabe asserts that the parties' business relationship is harmonious and mutually beneficial. The Court, however, is not persuaded that this business relationship, now impacted by the current litigation, would continue amicably until a trial on the merits.

[14] In accordance with Federal Rule of Civil Procedure 52(a), the foregoing Memorandum Opinion and Order constitutes the Court's findings of fact, conclusions of law and grounds for its action.